Good morning, Your Honors. My name is Jan Joseph Behar, and I represent the petitioner in this matter, Ms. Melinda Jaramillo. I would ask the Court to permit me two minutes for rebuttal. You may do so, Counsel, but just watch the clock. It counts down there, and it will tell you your remaining time. Thank you. Your Honors, the main issue in this case is that the government cannot meet its burden of showing that this person is deportable by clear, convincing, and unequivocal evidence, when the only evidence that it presents is statements by the petitioner which were coerced and involuntary. In Choi v. Barber, this Court clearly stated that expulsion cannot turn upon utterances cudgeled from the alien from governmental authorities. Statements made by the alien to achieve the deportation must be voluntarily given. Were they cudgels? I'm sorry? You said cudgeled. I mean... That is the way the Court put it. I think that what it means... Were there cudgels here? I mean... I think there were. I think there were, Your Honor. And the problem here is that if we set the stage, we've got a 22-year-old unwed mother crossing the border with a person in her car, which she believes, or she stated to the officer that she believed, had... She's never denied, in fact, knowing the true facts, has she? Your Honor, she was told... In fact, she did. She said... She hasn't in her argument to us. No, not in the arguments to you, because that's not really what this case turns on. This case doesn't turn on what is the truth or what is not the truth. What this case turns on is on whether the government has met its burden to prove by the appropriate evidence that she, in fact, knew that the person... If you could demonstrate the facts were untrue, it would go a long way towards saying she simply said what she thought she had to say to get out of a bad circumstance. But if the facts turn out to be true, it's not quite such an easy inference that she didn't, in fact, simply tell them what she knew to be the case, that she was assisting the entry of an alien into the United States. What she did is she was taken into custody. An hour or so later, she is interrogated by an officer. She tells him, I didn't know this person was undocumented. I went to my mother-in-law's house. The girl came and said, would you give me a ride back to the United States? She said, do you have papers? Yes, I do. Here's my birth certificate.  That's what she said to the officer. Now, the officer, 250 pounds, six foot tall, sits there, crosses his arms and says, tell me a believable story. We're going to sit here until you tell me a story that I can believe. And if you don't tell me a story I can believe, then I'm going to put you in jail. So I think that that's coercion in the best of circumstances. Furthermore... Well, she didn't respond by saying, well, I'm only telling you the truth. She told him a story that she thought he would believe because he made it very clear that they were not moving from there until she told him a story that he found believable. Now, the circumstances surrounding the interrogation are extremely important. It's late at night. She's a young person. She's told, you're not going anywhere until you tell me a story that I believe. And she has never read her rights. She has never told you have the right to consult with an attorney. And she's never told, I can only hold you for 24 hours. If she's told, I can only hold you for 24 hours, she may just say, fine. I'll just sit here for 24 hours and I won't say anything, which is really her right. But at no point is she told that she has a right to see an attorney or to consult with anyone or to make a phone call or anything. She's just sitting there until she tells the officer a story that he believes. Now, it continues, obviously. The case eventually goes to the trial. The BIA says, gee, the judge touched on this issue about the videotape, but he never really ordered it. And the respondent, or in this case the petitioner here, never really addressed it. They just addressed it at the very beginning and then it was never brought up again. That is completely untrue. And a review of the record will very clearly show that there were five hearings in this matter. The issue of the tape was brought up vehemently at every single one of those five hearings. Were you the lawyer? I was. And you were offered an opportunity to go to the government office to review the videotape, as I read the record. Am I right? That is correct. And you did not do that? That is correct. Why not? Because I did not want to go and view the videotape, Your Honor. I wanted that videotape so that it would be shown to the judge. But now you're unable to tell us that there's anything on the videotape that advances your case. The transcript, you're not disputing, the transcript is accurate. No. I couldn't find anywhere in here, tell me what I missed, where anybody says the transcript is inaccurate. I didn't say the transcript was inaccurate. That's the point. The judge asked me, do you believe that, do you trust the transcript? And I said, no, I don't. And he said, why? Because there are mistakes in transcripts very often. You know, what gets me, I can't understand why, given the opportunity to go to see this videotape, if you now claim that this is the most important thing on your client's behalf, that you did not take that opportunity. Then you could have gone to the court and said, I've looked at the videotape, here's what it says, I've compared it against the transcript, the transcript is wrong. It seems to me that you either waived or forfeited your opportunity to complain about the videotape. What have I missed? Well, with all due respect, I disagree. And the reason I disagree. Why didn't you go to see it? I did not go to see it because my concern was in having that document entered into the court. How would going to see it impede your ability to get that videotape in court or to complain about its absence? It could only enhance it because you would then be able to say, instead of speculating, here's the problem between the transcript and videotape. Or here's what the videotape shows that can't be conveyed by way of the transcript on behalf of my client. My concern was I did not want to be a witness in the case. I wanted that videotape. Lawyers aren't witnesses when they go to depositions or look at discovery. My point was I wanted that tape presented to the court. With all due respect, it seems to me that you felt that your case was better off without the tape, that you'd be able to complain about its absence. Your Honor, that's your opinion. But the truth of the matter is that I asked for that in five different hearings. You can't tell us why you don't know what difference it would have made. You could have gone to see it and you would have been able to tell us, as you could have told the IJ, what difference it would have made. But because you didn't go see it, you're asking us to speculate that it might have made a difference. I'm not asking you to speculate. I'm asking you to find that when a judge orders the government to tell, to provide that tape. What's the prejudice? What's the damage? What's the prejudice here? You can't tell us because you didn't go see it yourself. The prejudice is that that tape is the – what you have here is a he said, she said problem. And you had the opportunity to resolve that he said, she said, and you didn't take it. I don't think so. I think that the opportunity to do that was that one objective piece of evidence. It's not evidence if I go look at it. It's evidence if it comes into the record. The next time you're confronted with this problem in a videotape that they tell you I'll be able to – you'll be able to see it, will you do the same thing or will you go look at it? Well, based on your recommendation, I would go and look at it because I don't want to have to face this again. But the issue, Your Honor, is that when – there was a game going on here. The judge said bring – Yeah, you were part of the game. The judge said bring the videotape, and the government attorney said I need 60 days to go find it. Fine. Tell me when. July 19th. Okay. So July 19th comes around. He submits a written statement. It's our tape. We're not giving it to you. But if you want to bring a recorder to the court and record it in front of the judge, we'll be fine with that. And the judge says over my dead body. It's not going to happen in this court. Counsel, you're down to a minute and a half. I just mentioned that to you in case you want to reserve that time. I'll reserve. Yes, you may do so. We'll hear from the government. May it please the Court. I'm Susan Green for the Attorney General. Apropos to this videotape problem, I want to clear up a very important point in my opinion, and that is if you read Ms. Jaramillo's brief, you might get the idea that the government simply withheld the videotape. That is not what happened. If you look at the record at page 124, by the time of the hearing, that tape had been lost. The immigration judge asked the government. Whose fault is that? What? Whose fault is that? It's not a question of whose fault. Answer me a question. Yes, sir. When this tape originally came up, the government coughed up an English translation but claimed it would, quote, constitute improper procedure to turn over a copy of the tape. What is that all about? Well, what happened is that immediately when the case was filed, the government filed the I-213, and it referenced the fact that there was a videotape. Then Ms. Jaramillo immediately asked for it to be produced, and the government filed a response and said, we can no longer copy it, but we have three proposals. One is that you could come to our office and listen to it. The second is that you could copy it at the immigration proceedings with your own equipment because we can't do this anymore. Or the third thing is that you can file a FOIA request. So she didn't like the first two. What's the reason for that response? I mean, if the court says, turn it over, the government is saying. . . The court said that, you know, he never said give her your copy. He said when the government came up with the problems with their procedures, he said the government can't do what's not in its procedure, but she had a remedy. Why can't the government make a copy and turn it over? Well, they said that they no longer had the budget for giving copies of the tape. You know, this is crazy. This is very weird. You know, these cases might not be that important to the larger firm, but this is the most important thing probably that will ever happen to Mrs. Jaramillo. The government has a tape. The tape seems to be at the center of the whole controversy, which is whether or not this whole thing was coerced, and the government is saying this is improper procedure. Your Honor, it's not at all that the government refused to make the tape available. That's not what happened. What happened is they produced the transcript, and then they gave her three options for how to access the tape, and one was the FOIA request. FOIA? Yes, sir. You know, I ran that FOIA thing. That's like telling somebody we have a copy on Mars. Go get it and come back. And then it got lost, right? It did get lost, Your Honor. That's true. But the legal test for this is clear. Counsel, I must say I'm quite startled that in a pending proceeding, the government would ask the petitioner to file a FOIA request? That's almost unheard of. In terms of active pending proceedings, it's totally different if you're looking for something that has nothing to do with the case. Well, I'm sorry that I can't speak to why those procedures were adopted. That wasn't something that was litigated. But the legal test before the court now is whether it was fundamentally fair, and that's the question that was before the IJ and the board. What was fundamentally unfair? Whether it was fundamentally fair to have the evidence, the I-213 and the report of the investigation as evidence in her proceeding. And what the immigration judge and the board looked at is the fact that she had the transcript. The transcript was in what? I'm sorry? What language was the transcript in? The transcript was in English, yes. What was the conversation? It was in Spanish. Mostly. There was a little bit of English. So you've got a transcript that's been translated by somebody. You know, I have the good fortune of having grown up in Mexico, and I've dealt with these translations a lot. And it's rare that a translation isn't full of mistakes. So you've got a transcript that's done by a translator. I mean, you're talking about triple problems here. Well, I mean, it is true that she could have tested that. She could have said, this isn't what I said. She could have shown by her own testimony. And isn't the best way to do that is to have access to what she said? I mean, you're asking her to remember what she said. And if you believe what the other side says, she was scared. She was in a room for hours. Her story was changing. It seems to me she should have had the original copy of the tape. And, Your Honor, if the copy of the tape were still available. You said go ask FOIA, and FOIA said, gee whiz, we misplaced it. Well, the problem is, is that it was lost. And then the question is what to do after that. And at that point, she had the transcript. She could test that transcript by her own testimony and by cross-examination of the three CBP officers. They didn't remember anything. Well, I mean, that's not entirely true. One of them remembered the fact that she had said that she had $600 because she knew. That's about it. That's about it. I mean, these officers, it wasn't surprising. I mean, they handled thousands of these kinds of situations. Pretty much they don't remember a damn thing. That's right. But they had their reports, and they. . . Yeah, so they were testifying from reports. Yes, sir. And this whole thing is to be very vague. It's true. It's true. Counsel, you say the tape was lost, but you invited him to come in and see it. I don't understand that. Well, see, obviously they had the tape at one point. They wouldn't have been able to make the transcript. Not so obviously. Not so obviously. I mean, you made this offer to them, and it had already been misplaced. We don't even know it even existed when you made the offer. No, that's not true. I mean, it was transcribed. Oh, so you had it? You had it? At your office? DHS obviously had it at one point because. . . Well, wait a minute. You had it in your office? Are you talking to me personally, or are you talking about DHS? You made them an offer, come in and see it. Where was it? The DHS attorney indicated they had it at that point. Okay, and so what happened then? I'm sorry that they don't know what happened. It was offered for him to come in. He said he wasn't interested. They said they offered to bring it to the court to be copied, and he wasn't interested, and the court also said. . . So it wasn't lost at that stage. No, Your Honor. What's the status of it today? All I have is the record, and the record indicates as of the date of the hearing that it was lost. On page 124 in September 22, 2005, it was lost. And I do want to make one more point, and this is something that the Board relied on, is that on September 22, the immigration judge asked about the status of it, and the DHS attorney said, Your Honor, I don't have it. I don't know where it is. And the judge said, and this is the quote that Ms. Jaramillo highlights, this is highly unsatisfactory. He was talking about the fact that the tape was lost was highly unsatisfactory. And he said, but at this point, what to do now? I'm going to put on the testimony. And he put on Ms. Jaramillo, and then he put on the two CBP officers. They ran out of time that day. They had to continue the case for almost a year. It went from September to the next July. They took a third CBP officer's testimony, and then he asked for a closing argument. And Ms. Jaramillo's attorney did not go back to this issue about the actual tape. At that point, she argued based on the evidence that was before the judge, the testimony. And so the immigration judge, he did not return or revisit this issue about the tape being lost, because at that point she had not raised it anymore either. He went ahead and – You're arguing waiver? How many times do you have to raise it? Well, he said we'll come back to it, and then he asked for a closing argument, and she didn't mention it anymore. What's he supposed to do? Now the tape is gone. Well, he could do what he's doing today, and that is argue that that was important that he didn't argue that to the immigration judge. Sounds to me he was standing on his head yelling it was important, and so everybody said it's no longer around. Well, and at that point, if that continued to be important, you know, a year later or nine months later. You don't think it continued to be important? Well, it was up to him, the attorney, to continue to urge that to the judge. And the judge decided the issues that the attorney presented to him in his closing. You know, none of this is your fault. I mean, you just inherited this. No, but I represent the government. Well, then it is your fault. I wish the tape weren't lost too, but the question is what happens in this proceeding and what does the Constitution require at this point? The Constitution requires a proceeding that's fundamentally fair, and it requires for a due process violation, it requires a showing of prejudice. Is there anywhere in the record where they dispute the tape? She says what's on the tape is not right. No, I don't believe so. I certainly haven't seen anything. So we seem to be operating from a premise that the translation on the transcript is correct. Yes, sir, I think so, and I think in her argument, my recollection of her argument is that she's talking about things like demeanor and so forth, I mean, that seems to me to be perhaps suggest that they don't disagree with the translation. So do you want me to continue to address my other points, or it was just the thing you were most interested in? Whatever you'd like to say in 15 seconds. I would like to say that I pray the court to deny the petition for review. If there are no further questions, I'll sit down. Thank you. Thank you. Mr. Behar, you have some reserve time. Thank you, Your Honor. Very briefly, as His Honor said, I practically stood on my head trying to get that tape. But what's the damage at this point from not having it? Your Honor, this is a case in which the only evidence that was submitted was her alleged statement to Gardena that she admitted that she knew about this person's. There seems to be no dispute that the transcript is correct. I guess. I didn't see it. That's the problem. The issue is not the transcript. The issue is what her demeanor was and whether this was coerced out of her. The very last line on that transcript, the officer says, so were all these statements given voluntarily? And she looks at her and question mark, voluntary? Obviously, she's not getting it. Something is not right in the transcript. And I think that that's why the tape is so incredibly important. The other thing, which is also crucial, is there is no statement from the alleged alien. There is no interrogation of the alien. There is no report on the alien. There is no videotape of the alien. And the judge asked for it several times. You mean the girl? Yes, the smuggler. This is like having an importation of marijuana case where the only thing they've got to present to the court is, well, he confessed to us that he brought the marijuana unknowingly. Well, yeah, but there was evidence that she was in the car. I mean. I understand. But now, you know, when he contests his statement as having been coerced, gee, the officers didn't keep the marijuana. They never tested it. They never did anything. They never took a statement from anyone. And now the only thing that's left is this. That would not pass muster in this court. And I don't see where this should either. Thank you, Counselor. Your time has expired. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Clifton